COPELAND *v*. CITY OF MAGNOLIA.

4-9601                                    242 S. W. 2d 143

Opinion delivered July 9, 1951.

Rehearing denied October 8, 1951.

*J. G. Milham*, for appellant.

GRIFFIN SMITH, Chief Justice.   As is usual with lawsuits that develop bitter controversial phases, the testimony here is at sharp variance respecting employment of Spencer & Spencer (attorneys) by the appellants, and regarding consent of the condemnation defendants to arbitration.

The City of Magnolia needs certain real property for municipal airport purposes. When the property could not be purchased it instituted actions to condemn and to fix compensation. The complaint contains a statement that it is not necessary to take oil, gas, and other minerals, but that certain drilling and operating restrictions are essential.[1]

---

[1] The restrictions exception reads: "No person, firm, or corporation shall build, erect, construct, or maintain, any derricks, tanks, structures, pits, or other physical hazards of any kind or character on the surface of said airport at any location within 300 feet of the center line of the runways and/or landing strips and 200 feet of the center line of the taxi strips that may be constructed."   [Certain secondary precautions were mentioned].

The suit against Copeland, an old Negro who owns 40 acres, was filed June 28, 1950, and answered August 18. Sam Spralls and his wife own 34 acres. As to them suit was filed July 7. Answer was filed by Spencer & Spencer the same day they answered for Copeland.

On September 12, a regular day of the court term, the proceedings against Copeland were reached on the docket call, whereupon there were filed what purported to be (a) an agreement between the plaintiff and defendants (including the Spralls and others) for arbitration; (b) a resolution of the City authorizing the Mayor to execute an arbitration agreement; (c) the appointment of a third member of the appraisal committee, and (d) the appraisers' affidavits. The contentions in each case are substantially the same. Appellants insist they are not bound by the agreement to arbitrate because (a) their relations with Spencer & Spencer were not those of client and attorney, or principal and agent; (b) they did not understand the transaction, were not familiar with court procedure, had no thought of paying a fee for representation, but (c) if any discussions occurred, they (the appellants here) were overreached and should not be bound; (d) under the constitution there is always the right of trial by jury to determine whether the property is being taken for a public purpose, and to fix just compensation.

The award in favor of Copeland was $3,000. Of this sum $2,400 represented the fair market value of the land, while $600 was to compensate damages to other lands owned by Copeland, including damage to oil, gas, and minerals which were reserved to the defendants; but, as to these, there were the restrictions heretofore mentioned. See footnote No. 1.

Spralls and his wife were allowed $2,301 for the land and $600.35 for damages similar to those mentioned in the Copeland judgment—a total of $2,901.35.

Copeland and Spralls denied attending any of the court proceedings.

The contract relied upon by Spencer & Spencer included about twenty property-owners. Copeland is alleged to have signed by mark. The writing offered in evidence called for a fee of 20% of any sum recovered, either by settlement or judgment. Two checks, one to Copeland and Spencer & Spencer, and the other to Spralls, Spencer & Spencer, and other interested persons, were drawn. Appellants refused to accept settlement on the basis the attorneys said they were entitled to under the contract.[2] Thereupon Spencer & Spencer (Nov. 7, 1950) filed a petition asking that the judgment in Chancery Case No. 132 (styled *City of Magnolia* v. *Nathaniel Henry* and [other designated defendants] be modified. The First National Bank—a cashier's check having been issued—was named as a defendant. The prayer was that the check be split, one payable to the respondents in settlement of their respective interests, the other ($580.28) payable to Spencer & Spencer as their fee. A similar action was filed against Copeland, who responding Nov. 20th filed his motion to vacate the condemnation judgment of October 18th. He alleged fraud in the procurement in that Spencer & Spencer were not his attorneys, and asserted a meritorious defense, including the want of due process.

Appeals are from judgments denying all essential contentions.

J. V. Spencer, Sr., testified that his firm represented a number of condemnation defendants; that Copeland's son asked him to "go by" and see his father, and thereafter the witness and Appellant Copeland went together to Nathaniel Henry's home, where the matter was discussed. Copeland said he wanted to join with the others, then authorized his son to sign the contract, first having touched the pen. [Copeland's signature is by mark]. Later, when the proposal to arbitrate[3] was current, Cope-

[2] The check for $2,901.35 was payable to Nathaniel and Gena Henry, Sam and Mattie Spralls, Lee and Grady Spralls, Ninnie and Leroy Thomas, and Spencer & Spencer.

[3] The agreement to arbitrate permitted landowners to name one representative, the City another, and the two so selected to name a third.

land agreed it was the proper thing to do; again he authorized his son to sign for him, and touched the pen. The witness, (referring to himself) said: "I was over here several times. I made it a point to go by and discuss [the matter] with him, as well as with the others."

Spencer, in testifying, admitted very frankly that he did not see Spralls sign either the contract of employment or the agreement to arbitrate. However, after they had apparently been executed they were discussed, and Spralls admitted that he did agree to arbitrate. Spralls thought his daughter must have signed the contract. He then asserted: "I never did agree with anybody to arbitrate for an award." Regarding the contract, Spralls was asked on cross-examination: "Who signed the [employment] contract: do you know who signed it?" A. "No, sir, I didn't sign it: my daughter must have signed it." Q. "Your sister signed it, didn't she?" A. "Yes, sir. You can asked the colored man here in the room: he will tell you the same thing."

As to the appraisement agreement Spralls admitted that he was at the home of his brother-in-law (Nathaniel Henry) "one time" when Spencer was there. He was also in Attorney Clegg's office "for a while" when appraisers were selected:—"I thought it was over with, and I left and went back on the job."

A little later he was asked whether he agreed that Jim Kendricks should be one of the appraisers. The reply was: "Yes, sir. I didn't accept any of the others, and I told them if I couldn't get the appraisers I wanted I wouldn't take any at all. That is what I told Mr. Kendricks, and I told [Mr. Spencer] the same thing."

There was other evidence, (Copeland did not testify) some in support and some in contradiction, of appellants' contentions. The court patiently heard these witnesses, had an opportunity to observe their demeanor; was familiar with the entire record, and was no doubt favored with argument touching the issues. Result was that the checks were ordered reissued and contentions of the peti-

tioners were overruled. Our duty is to determine whether there was an abuse of discretion, and the answer is contrary to appellants' position.

Affirmed.